Filed 10/27/25  P. v. Siqueros CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B336453 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA010224) |
| v. | |
| MICHAEL SIQUEROS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Rogelio Delgado, Judge.  Affirmed.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Stacy Schwartz and Colleen M. Tiedemann, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

Defendant Michael Siqueros appeals from an order denying his petition for resentencing pursuant to Penal Code section 1172.6.[1]  Defendant contends there was insufficient evidence to support the trial court's finding that the prosecution proved beyond a reasonable doubt that he could still be convicted of felony murder as a major participant who acted with reckless indifference to human life.  We affirm.

# II. BACKGROUND

A. *Underlying Conviction*

    1. <u>Factual Background</u>[2]

        a. Prosecution

Rudy Jaime, the murder victim, lived in El Monte in a "very small" house.  Codefendant Conrad Estrada's girlfriend was the daughter of Jaime's former housemate, Ophelia Ramirez.  Estrada knew that Jaime owned several rifles, which he kept

---

[1]    Further statutory references are to the Penal Code.
The Legislature renumbered section 1170.95 as section 1172.6 effective June 30, 2022.  (Stats. 2022, ch. 58, § 10.)  For clarity, we will refer to section 1172.6 throughout this opinion.

[2]    We judicially notice the record in defendant's direct appeal. (*People v. Estrada* (Sept. 29, 1994, B073164) [nonpub. opn.].)  The factual background is taken from the reporter's transcript of the trial proceedings.

stored under his bed. Ramirez had moved out of Jaime's home one or two months prior to the killing and left behind some personal items for which she did not have room in her new home. Ramirez did not give Estrada permission to recover her items from Jaime's house.

On October 7, 1991, Maria Gallardo was visiting a family member who lived next door to Jaime. Sometime between 6:00 and 6:30 p.m., she noticed a white truck parked in front of Jaime's residence and saw Jaime in his front yard, speaking to two men. Both men were wearing shirts at that time. After they finished speaking to Jaime, the two men walked to the white truck and entered it. Jaime then locked the gate around his house and went inside.

After about 10 to 15 minutes of sitting inside the truck, the two men got out, jumped over the gate, and forced their way into the home. Gallardo then heard the sound of fighting coming from inside the house, which lasted for at least 10 minutes. She then saw the two men leave the house. One was carrying a television, which he placed on top of a cement pillar. The two men then went back into the house and Gallardo heard "[m]ore fighting noises." She called 911.

El Monte Police Department Officer Santos Hernandez and his partner responded to the 911 call. Hernandez saw defendant, who was shirtless, pick up a large rifle which was inside a case. When defendant tried to remove the rifle from the case, Hernandez yelled at him to stop and to come out of the house with his hands on his head. Defendant did not comply and instead ran back and forth in the house before putting down the rifle and trying to climb into a crawl space in the ceiling. Police

3

officers eventually arrested defendant and Estrada.  At the time of his arrest, Estrada was wearing a shirt.

Police officers then entered the home and found Jaime lying on his back in the living room.  He had suffered multiple cuts and stab wounds to his chest, neck, and head.  When a police officer asked Jaime how many people were responsible for what happened to him, Jaime held up two fingers and said, "'two, I think.'"  Jaime indicated that he did not know the suspects.  Before he could be transported to the hospital, Jaime stopped breathing and his heart stopped beating.  He was pronounced dead at the hospital.

Inside the house, police officers observed the aftermath of what appeared to have been a fight in several rooms, including the kitchen and the living room.  Blood was "all over the place" in those rooms.  Police recovered from the scene a bloody knife and a bloody and bent fork.

As defendant was being transported by police to the police station for booking, he asked an officer what he was being arrested for, to which the officer responded attempted murder and burglary.  Defendant then began cursing at the officer and said, "'I am the one you want'"; "'Yeah, I am the mother fucking one you want, asshole'"; "'Wait until I get out of prison.  I am going to kill your mother fucking ass'"; and "'You won't find any fucking weapon on me.  I haven't got a mother fucking thing on me.'"  At the time of his arrest, defendant had a moderate amount of blood on his hands and a fresh cut on his left little finger.

After defendant was booked into custody, he saw police officer Albert Reneer, whom he recognized from the prior evening, when defendant was involved in a fight at a bar owned

4

by defendant's aunt. Defendant asked Reneer to tell defendant's aunt that he would not be seeing her for 40 years.

A Los Angeles County Sheriff's Department criminalist analyzed blood stains from the scene of the crime and clothing that defendant and Estrada were wearing at the time of their arrest. Jaime's blood was found on, among other items, defendant's boxer shorts and Estrada's pants. A "considerable" amount of blood that belonged to either Jaime or Estrada was found on defendant's pant leg.

The victim's son found a balled up and bloody blue shirt, which did not belong to Jaime, between the couch and the wall in the living room.

A Los Angeles County Medical Examiner (the coroner), examined the victim. Jaime had 20 to 30 lacerations or incisions to his body, and seven to 10 stab wounds, with six of those wounds being the most significant in causing Jaime's death. The lacerations and most of the wounds were consistent with having been made by a knife. The coroner also found wounds on Jaime's face that were consistent with having been made by the bloody and bent fork.[3]

b.     Defense

Defendant testified that he first met Estrada on the day of the killing, at a mutual friend's house. He and Estrada drank some beer and then defendant asked Estrada for a car ride home. Estrada agreed but drove to Jaime's residence in El Monte.

---

[3]     Defendant presented testimony from a pathologist, who opined that these wounds were consistent with having been inflicted by a knife, not a fork.

5

Defendant did not know Jaime.  After the three men drank beer, defendant and Estrada returned to Estrada's vehicle, where Estrada asked defendant to help him move a television. Defendant agreed.  After defendant moved the television outside, he returned to the house and heard Jaime and Estrada arguing. Defendant went into the kitchen and heard the sound of a fight from the living room.  He entered the living room and was shocked to see Jaime's body on the floor.  Defendant claimed that he was shirtless when he first entered the home.

### c.     Estrada

Estrada testified that he stabbed Jaime in self-defense after Jaime came at him with a kitchen knife.  Estrada admitted to using a knife but denied using a fork to stab Jaime.  He denied that defendant was involved in the altercation with Jaime.  On the day of the killing, Estrada wore a white t-shirt, which became ripped during his struggle with Jaime.

### 2.     Trial, Sentence, and Direct Appeal

On September 30, 1992, the Los Angeles County District Attorney (District Attorney) filed a second amended information charging defendant and codefendant Estrada with murder (§ 187, subd. (a)), with the special allegation that the murder was committed while defendants were engaged in the commission of a robbery and a burglary (§ 190.2, subd. (a)(17)).  The District Attorney further charged defendant and Estrada with first degree robbery (§ 211) and first degree burglary (§ 459); and alleged that defendant had two prior serious felony convictions

6

(§ 667, subd. (a)). The District Attorney also alleged that defendant and Estrada personally used a deadly and dangerous weapon, namely, a knife, during their commission of all three crimes (§ 12022, subd. (b)).

On October 28, 1992, a jury convicted defendant of first degree murder, first degree robbery, and first degree burglary, and found true the allegations that the murder was committed during the commission of the robbery and burglary. The jury found not true the allegation that defendant personally used a deadly weapon, to wit, a knife, in connection with the three crimes, but found the allegation to be true as to Estrada for all three crimes. The court found beyond a reasonable doubt that defendant had two prior serious felony convictions.

The trial court sentenced defendant to an aggregate term of life without the possibility of parole, plus 10 years for the prior serious felony convictions. We affirmed the conviction on direct appeal. (*People v. Estrada, supra*, B073164.)

B.      *Section 1172.6 Petition*

On February 28, 2019, defendant filed a section 1172.6 petition. The trial court appointed counsel to represent defendant and, on March 24, 2020, denied the petition, finding defendant had failed to make a prima facie case for relief.

On June 15, 2021, we reversed that order and remanded for the trial court to issue an order to show cause and hold an evidentiary hearing. (*People v. Siqueros* (June 15, 2021, B305887) [nonpub. opn.].)

On January 18, 2023, the District Attorney filed a response to the section 1172.6 petition, asserting that defendant was a

7

major participant in the underlying felonies who acted with reckless indifference to human life.

On December 20, 2023, defendant filed a brief for the hearing.

On January 8, 2024, the trial court held a hearing pursuant to section 1172.6, subdivision (d)(3). The District Attorney submitted as evidence the reporter's and clerk's transcripts from defendant's trial. Defendant submitted into evidence various photographs and documents.

Following argument by the parties, the trial court discussed, at length, the evidence presented at trial and found that the prosecution had proven beyond a reasonable doubt that defendant was a major participant who acted with reckless indifference to human life and denied the petition. Defendant timely appealed.

## III. DISCUSSION

Defendant contends that substantial evidence does not support the trial court's finding that defendant acted with reckless indifference to human life. We disagree.

A. *Section 1172.6 and Felony Murder*

"Senate Bill [No.] 1437 altered the substantive law of murder in two areas. First, with certain exceptions, it narrowed the application of the felony-murder rule by adding section 189, subdivision (e). . . . Under that provision, 'A participant in the perpetration or attempted perpetration of a [specified felony] in which a death occurs is liable for murder only if one of the

8

following is proven:  [¶]  (1) The person was the actual killer.  [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.  [¶]  (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.'  (§ 189, subd. (e).)  [¶]  . . .  [¶]

"Senate Bill [No.] 1437 also enacted former section 1170.95 [renumbered as section 1172.6], which created a procedural mechanism 'for those convicted of felony murder . . . to seek relief' where the . . . substantive changes described above affect a defendant's conviction. . . .  [¶]  Under section 1172.6, 'A person convicted of felony murder . . . may file a petition with the court that sentenced the petitioner to have the petitioner's murder . . . conviction vacated and to be resentenced on any remaining counts . . . .'  (§ 1172.6, subd. (a).)"  (*People v. Curiel* (2023) 15 Cal.5th 433, 448–450.)

At a section 1172.6 evidentiary hearing, "the prosecution bears the burden 'to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder' under the law as amended by Senate Bill [No.] 1437 (§ 1172.6, subd. (d)(3)).  In addition to evidence admitted in the petitioner's prior trial, both '[t]he prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens.'  (*Ibid.*)  'If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.'  (*Ibid.*)"  (*People v. Wilson* (2023) 14 Cal.5th 839, 869.)

9

"[A] trial court's denial of a section 1172.6 petition is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ""in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."" [Citation.]" (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)

B.     *Applicable Law*

"Reckless indifference to human life is 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' [Citation.] Examples include 'the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property.' [Citation.] Reckless indifference 'encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.' [Citation.]

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, "'[t]he risk [of death] must be of such a nature and

10

degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'" [Citations.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death"' satisfies the statutory requirement. [Citation.] Notably, 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life. [Citations.]

"We analyze the totality of the circumstances to determine whether [the defendant] acted with reckless indifference to human life. Relevant factors include: Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony? [Citation.] "'[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient.'" [Citations.]" (*In re Scoggins* (2020) 9 Cal.5th 667, 676–677, citing *People v. Clark* (2016) 63 Cal.4th 522, 617–623 (*Clark*).)

11

C.    *Analysis*

1.    <u>Physical Presence and Opportunity to Restrain
Confederate or Aid Victim</u>

Presence is important to culpability because it allows a
defendant to observe his cohort's actions and demeanor and
determine whether his cohort's behavior tends to suggest a
willingness to use lethal force.  (*Clark, supra*, 63 Cal.4th at
p. 619.)  Presence also provides a defendant opportunities to act
as a restraining influence on his cohort and to render aid to a
wounded victim.  (*Ibid.*)

Here, by defendant's own admission, he was present during
Jaime's beating and stabbing, and the blood on defendant's pants,
boxers, and balled-up shirt demonstrated that defendant was in
close proximity to Jaime during the assault.  Further, the
evidence at trial supported a finding that defendant was not only
present for the assault but also participated in it.  Indeed, at the
time of his arrest, defendant had blood on his hands and a fresh
cut on his finger.  Jaime indicated that two people were
responsible for his injuries.  Moreover, the coroner testified that
Jaime's injuries were consistent with having been stabbed by a
knife and a fork.  Estrada admitted he used a knife to stab Jaime
but denied using the fork.  On this record, the trial court could
have reasonably concluded that the bent and bloody fork had
been used by defendant, the only other person present during the
assault.[4]  Defendant's physical presence and opportunity to

---

[4]    Defendant contends that the jury found he did not stab
Jaime with a fork because it found the deadly weapon
enhancement to be not true.  (See CALJIC 17.16 [defining

12

restrain a confederate or aid the victim weigh heavily in favor of a finding of reckless indifference.

### 2. Duration of the Crime

The evidence at trial demonstrated that Jaime was beaten for at least 10 minutes before defendant and Estrada left the house, only for them to return to continue the robbery and beating. The duration of the crime therefore supports a finding of reckless indifference.

### 3. Defendant's Knowledge of Cohort's Propensity for Violence

It was undisputed that defendant did not know either Jaime or defendant prior to the day of the murder. Nonetheless, and as the trial court expressly found, by the time defendant left the house after the first beating, he was well aware that Estrada had a propensity for violence and nonetheless reentered the house with him. Defendant's knowledge of Estrada's propensity for violence therefore favors a finding of reckless indifference.

---

personal use of dangerous/deadly weapon under § 12022, subd. (b)].) We disagree. The jury found that defendant did not use a deadly weapon, "to wit, a knife," in the commission of the crimes. Although the prosecution made a motion to amend the information to add an allegation that defendants used a fork as a deadly weapon, the court held that motion "in abeyance" and did not thereafter rule on it. The jury therefore was not asked to decide whether defendant used a fork as a deadly weapon.

### 4. Efforts Taken to Minimize Risk of Violence

The record demonstrates that defendant did not make any effort to minimize the risk of a violent attack on Jaime. Indeed, after the initial assault, which lasted at least 10 minutes, defendant left the home but decided to return. As the trial court noted: "If you want me to assume that Estrada was the main person that did the beating, you would have to infer that [defendant] knew. He knew there was violence. There was already violence once. And they come back for round two." This factor weighs in favor of finding reckless indifference.

### 5. Totality of the Circumstances

Analyzing the totality of the circumstances, we note that other evidence presented at trial supported a finding that defendant acted with reckless indifference to human life. For example, defendant's statement as he was being transported to the police station that he would kill the police officer once he got out of prison evinced a willingness to kill. (See *In re Scoggins*, *supra*, 9 Cal.5th at p. 676 ["Reckless indifference 'encompasses a willingness to kill . . .'"].) Further, defendant's statement that he would not see his aunt for 40 years, together with his actions in picking up a rifle when confronted by the police and his efforts at trial to deny that the bloody shirt found by Jaime's son was his, demonstrated a consciousness of guilt, that is, an acknowledgement that defendant was not merely present during the murder but instead engaged in criminal activity known to carry a grave risk of death. On this record, we conclude

14

substantial evidence supports a finding that defendant acted with reckless indifference to human life.[5]

---

[5] In his opening brief, defendant challenged only the trial court's finding that he acted with reckless indifference to human life, contending that the "trial court erred in denying the petition for resentencing because the evidence was insufficient to prove [defendant] acted with reckless indifference to human life." (Boldface omitted.)  In his reply brief, defendant purported to challenge both the court's reckless indifference finding and its finding that he acted as a major participant.  By raising his challenge to the court's major participant finding for the first time in his reply, defendant has forfeited his argument on appeal. (*People v. Choyce* (2025) 18 Cal.5th 86, 114.)  Even if defendant did not forfeit his argument on appeal, we would conclude, for the reasons discussed above, that substantial evidence supports the court's major participant finding.  (*Clark*, *supra*, 63 Cal.4th at p. 615 [the elements of being a major participant and acting with reckless indifference to human life "'significantly overlap'"].)

## IV.   DISPOSITION

The order denying the section 1172.6 petition is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM (D.), J.

We concur:

BAKER, Acting P. J.

MOOR, J.